Hart Realty Co., Inc., Appellant *v.* Wright Township Board of Supervisors, Appellee.

Argued December 16, 1982, before Judges BLATT, CRAIG and DOYLE, sitting as a panel of three.

*Arthur L. Piccone,* with him, *Ronald V. Santora,* for appellant.

*Ronald D. Oley,* for appellee.

OPINION BY JUDGE BLATT, March 25, 1983:

The Hart Realty Co., Inc. (Hart) appeals from an order of the Court of Common Pleas of Luzerne County which affirmed a decision of the Wright Township Board of Supervisors (township). Hart's request that the township waive a condition of the subdivision approval granted by the township's planning commission was denied by the trial court.

The facts are not in dispute. In early 1976, Hart, a developer, proposed phases 1 and 2 of its subdivision plan known as "Hart Estates". On March 8, 1976, the supervisors passed resolution No. 170, which adopted phases 1 and 2 of Hart Estates, contingent upon Hart's installing temporary on-lot sewer systems and capped sewers[1] which eventually could be attached to a future line of the Mountaintop Area Joint Sanitary

---

[1] Capped sewer refers to the capping of service laterals which will connect the on-site sanitary sewage collection system with the Sewer Authority's system. The sewers remain capped until a line of the authority's system is near enough to make a connection. Until that connection, the development is often serviced by temporary on-lot sewer systems.

Sewer Authority (Sewer Authority). The condition that Hart install capped sewers was imposed in accordance with Section 10.03(2) of the township's Ordinance No. 64 (Ordinance) which provides that, in the event that the Sewer Authority's trunk line is *planned* but not constructed, then the developer must construct a complete capped sewer system, plus temporary on-lot systems when needed.

In the summer of 1976, Hart asked the planning commission to waive the requirement for the installation of capped sewers under Section 10.03(2), and to allow Hart to develop permanent on-lot sewers as permitted by Section 10.03(4) of the Ordinance.[2]

The planning commission, however, denied this request in August 1976, noting that Hart Estates eventually would include nearly 250 homes and that the Sewer Authority intended to install a line to connect the new subdivision to its permanent treatment facility at Mountaintop Manor.

Later Hart withdrew its original application and submitted a new proposal to the planning commission, which apparently was the same as the original. The planning commission granted final approval on September 6, 1977, the said approval to last for two years, or until September 5, 1979, and to be contingent upon Hart's constructing roads and installing capped sewers within that two-year period.

When Hart failed to complete the construction and installation of the capped sewers within the two-year period, the planning commission withdrew its final approval of Hart's final plan on September 24, 1979. Subsequently, on October 18, 1979, Hart appealed the

---

[2] Hart, by way of expert testimony before the supervisors' hearings, presented evidence that option 3, providing for the installation of a self-contained sewage system, was not feasible due to the topography of phases 1 and 2 of Hart Estates.

revocation to the supervisors and requested them to waive the capped sewer requirement, asserting that the Sewer Authority had no plans to develop a line to Hart Estates. Hart again requested permission to utilize an alternative method of sewage treatment and disposal as permitted under subsection 4 of the Ordinance.[3]

After three public hearings, the supervisors concluded that Hart had not presented sufficient evidence to justify a waiver of the capped sewer condition. On

---

[3] Section 10.03 provides:

If the Authority [Mountaintop Area Joint Sanitary Authority] sewer system is not available near the area of the applicant's proposed sewer system or sewer facility, then the Board of Supervisors of Wright Township, assisted by the Authority will require, in order of preference:

1. A sanitary sewer collection system complete with collection sewer, service laterals and building sewers to be installed and connected to the Authority's sanitary sewer system with the connecting sewer or trunk between the proposed sanitary sewer system or sewer facility and the Authority's sewer system to be constructed and installed by the applicant; or,

2. If the Authority's sewage system is not yet accessible, but is *planned* by the Authority for extension to the area in which the applicant proposes to construct and install a sewer system or sewer facility, a sanitary sewage collection system, complete with collection sewers, service laterals, and with the service laterals capped in accordance with the specifications of the Authority shall be installed by the applicant in addition to the installation of temporary on-lot sanitary disposal systems. These collection sewers and capped service laterals shall be installed before streets and roads shown on the Final Plan are constructed.

3. If such Authority sanitary sewer system is not yet accessible, a sanitary sewage collection system complete with collection sewer, service laterals and treatment plant, in accordance with the Authority's specifications, shall be installed by the applicant. These collection sewers and service laterals shall be installed before the streets and roads shown in the Preliminary Plan are constructed.

appeal, the common pleas court affirmed this decision, taking no additional testimony.

The issue before us is whether or not, in light of the intervening circumstances concerning the Sewer Authority's plans or lack thereof to develop a trunk line to the Hart Estates, the supervisors abused their discretion[4] by refusing to waive the requirement for capped sewers. There is no doubt that, at the time the planning commission initially imposed the capped sewer condition on Hart, pursuant to Section 10.03(2) of the Ordinance, it believed that the Sewer Authority planned to install a trunk line connecting the Hart Estates to its system. The record is unclear, however, as to what evidence, if any, the planning commission relied on in reaching this belief. After a review of the evidence, we can see no support for the proposition that such a line was ever planned. The only testimony in the record concerning the Sewer Authority's alleged plan to construct a trunk line to the Hart Estates was given by Thomas B. Dilley, a registered surveyor who testified as follows:

> They have no plan period. No master plan, nothing that we have seen, any evidence, county-wise or township-wise, or authority-wise, in-

---

4. Any other feasible sewage disposal plan which is approved in-toto by the Board of Supervisors, Wright Township, and thereafter, by the Department of Environmental Resources, in which case it shall be the duty of the applicant prior to the submission of a final application to present with said application written approval of the proposed plan by the Pennsylvania Department of Environmental Resources.

[4] Where, as here, the trial court affirmed the supervisors' decision without taking additional testimony, our scope of review is limited to a determination of whether or not the supervisors abused their discretion or committed an error of law. *See Zajac v. Zoning Hearing Board of Mifflin Township*, 41 Pa. Commonwealth Ct. 7, 398 A.2d 244 (1979).

dicating that they have any intention of constructing that line because the termination of their jurisdiction is the Wright-Dorrance Township line, . . .[5]

Hart, in support of its contention that Section 10.-03(2) of the Ordinance is not applicable here, inasmuch as the Sewer Authority has no "plan" to run a line to the Hart Estates, introduced into evidence a letter from the Sewer Authority dated January 31, 1980, which stated that:

The Authority recommends to the Wright Township that Section 10.03(4) of the Wright Township Sewer Ordinance be applicable to the thirty-seven (37) approved lots in the Hart Estates because of lack of feasibility that the Authority will construct its Sanitary Sewer System to that portion of the Hart Estates because of lack of funding, the layout of the land and the size of the lots for approved thirty-seven (37) lots, and also due to the uncertainty of when that area will be sewered by the Authority.

Despite this letter, the supervisors concluded that: (1) since the date Hart obtained final approval, no changes have occurred with respect to: (a) Hart's subdivision plans, including layout, design, density or any other salient feature; (b) the geography and topography of the land comprising Hart's subdivision; or (c) *the actual and proposed sewage plans and facilities of the Sewer Authority.* As to the Sewer Authority's letter advising the board of its vote, the

---

[5] Later in his testimony, Dilley reiterated the fact that the Sewer Authority's master plan does not contain any plan to extend any lines to the Hart Estates. There is no evidence in the record which contradicts this testimony, or in any way supports the planning commission's belief in the existence of a plan.

supervisors concluded that the letter was not binding on them.

We note that the transcript of the supervisors' October 15, 1979 meeting reveals that they *did* discuss the fact that, if the Sewer Authority did not extend a trunk line to Hart Estates, then that "leaves the people of Hart Estates in a bind, a very serious bind in the sense that you are requiring them to build a capped sewer which may never, ever be used".[6]

The inflexible attitude of the supervisors as here indicated could result in a tremendous waste of resources, if Hart is required to build a sewer system which, through no fault of its own, could never be utilized. And, of course, this cost would be passed on to the purchasers of the homes.

Moreover, in light of the Sewer Authority's notification that due to a lack of funding, the layout of the land, and the size of the lots, there was a lack of feasibility that its trunk line would be connected to the Hart Estates, the capped sewer condition could no longer be applicable. Secion 10.03(2) of the Ordinance, which requires capped sewers, only applies when the Sewer Authority's trunk line is *planned*. Inasmuch as the Sewer Authority has indicated that it has no such plan, and considering its admission that Section 10.03(4) is applicable to the Hart Estates,[7] it is certainly surprising that the supervisors have persistently refused to acquiesce to Hart's request for a waiver.

We believe that the continued insistence of the supervisors on the fulfillment of a condition which, in light of the changed circumstances, is no longer ap-

---

[6] The very nature of the capped sewer requires that it be connected to a line of the Sewer Authority's system. Without the trunk line from the Sewer Authority, the capped sewer is useless.

[7] Hart has asked to be permitted to follow the recommendation of the Sewer Authority to install permanent sewers in compliance with Section 10.03(4) of the Ordinance.

plicable, has amounted to an abuse of discretion. We will, therefore, reverse the order of the court of common pleas, and remand for proceedings consistent with this opinion and consistent with Section 10.03 of the Ordinance.

ORDER

AND, Now, this 25th day of March, 1983, the order of the Court of Common Pleas of Luzerne County in the above-captioned matter is hereby reversed and remanded for further proceedings by the court consistent with this opinion.

Jurisdiction relinquished.